The State, *ex rel.* Stallard, *v.* White *et al.*

---

No. 9986.

## The State, ex rel. Stallard, *v.* White et al.

Purdue University.—*College Secret Society.*—*Mandate.*—The board of trustees and faculty of Purdue University can not make membership in a Greek letter fraternity or other college secret society a disqualification for admission as a student in the university, or require, as a condition of such admission, that an applicant, who may be a member of such a society, shall sign a pledge to disconnect himself from such society during his connection with the university, and admission, refused for such cause, may be enforced by mandate against the trustees and faculty.

Woods, J., dissents.

From the Tippecanoe Circuit Court.

*J. R. Coffroth, T. A. Stuart, T. B. Ward, R. P. DeHart, C. E. Lake, J. S. McMillen* and *W. F. Severson,* for appellant.

*J. A. Stein, W. D. Wallace, H. W. Chase, F. S. Chase, F. W. Chase, G. W. Collins, R. P. Davidson, J. C. Davidson* and *D. P. Baldwin*, for appellees.

NIBLACK, J.—This was an application by the State, on the relation of Samuel F. Stallard, against Emerson E. White, Harvey W. Wiley, David G. Herron, Langdon S. Thompson, Charles L. Ingersoll, Robert F. H. Weyher, John A. Maxwell, William F. M. Goss, Charles R. Barnes, Edward E. Smith, Edna D. Baker and Annie Peck, for a mandamus.

The complaint averred that the relator is now, and for many years last past has been, a resident citizen and taxpayer of the State of Indiana, and that he is now, and for several years last past has been, the duly appointed and acting guardian of the person and estate of Thomas P. Hawley, who is of the age of nineteen years, a native of the State of Indiana, and has always resided, and still resides, in said State; that, pursuant to the laws of the State of Indiana, Purdue University has been located and organized near the city of Lafayette, in said State, and that said university is now, and for several years last past has been, engaged in the education of a portion of the young men and young women, and of the children of this State; that said university is fully equipped with the necessary buildings and apparatus for the business in which it is engaged, and has a full corps of teachers; that the defendants to this proceeding are such teachers, and have assumed to be, have been heretofore acting as, and now are, the faculty of said university, with the said Emerson E. White as the president thereof; that said university is the agricultural college of the State of Indiana, and was endowed under and by virtue of an act of the Congress of the United States, entitled "An act donating public lands to the several States and Territories which may provide colleges for the benefit of agriculture and the mechanic arts," approved July 2d, 1862, and the acts of Congress supplementary thereto, and is maintained by the income of such endowment, and by appropriations made by the Gen-

eral Assembly of the State of Indiana; that said Thomas P. Hawley is a taxpayer of said State, was at the time hereinafter mentioned, and is now free from any disease or mental or physical defects and was then and still is, in all respects, qualified and fitted for admission, and had the right to be admitted, as a student in said university; that the defendants, so constituting and acting as the faculty of said university prior to the time hereinafter mentioned, and amongst others, made and prescribed the following regulation, known as regulation No. 3, for the government of said university:

"No student is permitted to join or be connected as a member or otherwise with any so-called Greek or other college secret society; and as a condition of admission to the university, or promotion therein, each student is required to give a written pledge that he or she will observe this regulation. A violation of this regulation and pledge forfeits the right of any student to class promotion at the end of the year, and to an honorable dismissal."

The complaint further averred that on the 8th day of September, 1881, the defendants, as teachers in and so constituting the faculty of said university, opened such university for the reception and instruction of students therein, that being the time appointed for the beginning of a school term in the university; that on said 8th day of September, 1881, the defendants, as such faculty, had the power and authority, and it was their duty to admit properly qualified persons as students in said university; that on that day the said Thomas P. Hawley, being then and there qualified for admission in said university as hereinbefore stated, and being desirous of pursuing a course of study, which had theretofore been agreed upon between him and the defendant White, as the president of the faculty, and which course of study was within the regular course prescribed by the faculty for the university, presented himself to the defendants, as such teachers and faculty, and asked to be admitted as a student to receive instruction in the university, and then and there tendered all the re-

quired fees for admission as a student therein; that at that time the university was not full, but there was ample room for said Hawley as a student therein; that the said Hawley was then ready and willing, has ever since been and still is ready and willing, to conform to all rightful and proper rules and regulations prescribed for the government of the university; that at the time the said Hawley so presented himself for admission in said university, the defendant White, as the president of the faculty, tendered to him a written pledge, which he, the said White, required him, the said Hawley, to sign, which pledge was substantially as follows:

"I do hereby state upon my honor that in the month of April last, when I applied for and received an honorable dismission from Purdue University, I was not a member of any so-called Greek fraternity, or other college secret society, and at the time I connected myself with a chapter of the Sigma Chi fraternity I did not intend returning to Purdue University. I do solemnly promise that I will disconnect myself as an active member of the Sigma Chi fraternity during my connection with Purdue University."

That said Hawley refused to sign said pledge, but then and there expressed himself as ready and willing to obey and conform to any and every existing rule and regulation of said university, and any and every rightful and lawful rule and regulation which might thereafter be prescribed by the proper authorities acting for the university, saving and excepting any rule or regulation which might forbid his connection with said Sigma Chi fraternity, or other societies connected with colleges, and commonly known as "Greek Fraternities."

The complaint then proceeded as follows: "And said relator avers that said Sigma Chi fraternity is one of a class of secret societies, which are and for many years have been established, permitted and encouraged in very many of the oldest and best colleges of the United States; that such societies are commonly known as 'Greek Fraternities,' from the fact that they are usually named from letters of the Greek alpha-

bet; that such societies embrace among their members presidents and professors in colleges, senators and representatives in Congress, judges, lawyers, physicians, ministers of the gospel and very many persons of almost every calling, distinguished for their intellectual and moral worth; that the object and aim of such societies is to elevate the standard of education, and to secure among their members advanced culture in the classics and in the liberal arts and sciences; that the basis of such societies is morality; that there is nothing in the constitution, aims or objects of such societies which is inimical to the constitution and laws of the United States, or to the constitution and laws of the State of Indiana, and that the tendency of such societies is to promote the moral and educational interests of their members, the true interests of learning, and the highest and best interests in every department of the institutions with which they are connected."

The complaint still further averred, that, upon the refusal of the said Hawley to sign the pledge tendered to him by the defendant White, as above set forth, the defendants, so constituting the faculty of said Purdue University, refused, and have ever since continued to refuse, to admit him, said Hawley, as a student in said university, assigning as their only reason for not admitting him as a student therein, his refusal to sign the pledge so tendered him by the defendant White. Wherefore the relator prayed that a writ of mandate might issue directed to the defendants commanding them to admit the said Hawley as a student in the university.

An alternative writ of mandate was issued to the defendants, who thereupon appeared to the action and demurred to the complaint, for want of sufficient facts to entitle the relator to the relief demanded; but, before final action was taken upon their demurrer, they moved to strike out, as irrelevant and immaterial, all that part of the complaint having reference to the character, objects and aims of the Sigma Chi fraternity, and of the class of college societies to which it belongs, and

which is included within quotation marks, and their motion was sustained.

The court then, upon further consideration, sustained the demurrer to the complaint, and, the relator declining to plead further, final judgment was rendered in favor of the defendants.

Error is assigned upon the striking out of a part of the complaint as above stated, and upon the decision of the court sustaining the demurrer to the complaint.

Purdue University constitutes no part of our system of common schools, and has no direct connection with that system; but it is an institution of learning primarily endowed by Congress, and continued in existence very largely by appropriations made by the General Assembly of this State. It is, therefore, an educational institution sustaining relations to the people at large analogous to those occupied by other public schools and colleges of the State, maintained at public expense, and one in which all the inhabitants of the State have a common interest. The general principles underlying the educational system of the State are, consequently, applicable to the government and control of Purdue University, and, in the absence of express legislative provisions, must be invoked in determining the powers which that institution may exercise.

The fourth section of the act of the General Assembly of this State, accepting the donation made by Congress for the support of agricultural colleges, and providing for the location and organization of Purdue University, approved May 6th, 1869, reads as follows:

" From and after the date of the location made as aforesaid, the corporate name of the Trustees of the Indiana Agricultural College shall be ' The Trustees of Purdue University,' and they shall take in charge, have, hold, possess and manage all and singular the property and moneys comprehended in said donations, as also the fund derived from the sale of the land scrip donated under said ' act of Congress,' and the increase thereof, and all moneys or other property which may hereafter at any time be donated to and for the use of said institution. They

shall also have power to organize said university in conformity with the purposes set forth in said act of Congress, holding their meetings at such times and places as they may agree on, and a majority of their number constituting a quorum. They shall provide a seal; have power to elect all professors and teachers, removable at their pleasure; fix and regulate compensations; do all acts necessary and expedient to put and keep said university in operation, and make all by-laws, rules and regulations required or proper to conduct and manage the the same."

This section confers no greater power on the trustees of Purdue University, as regards making rules and regulations for its conduct and management, than is usually conferred upon like officers of similar institutions, and leaves the question as to who are entitled to admission as students in that university to be determined by the principles underlying our general system of education to which reference has already been made.

The admission of students in a public educational institution is one thing, and the government and control of students after they are admitted, and have become subject to the jurisdiction of the institution, is quite another thing.

The first rests upon well established rules, either prescribed by law or sanctioned by usage, from which the right to admission is to be determined. The latter rests largely in the discretion of the officers in charge, the regulations prescribed for that purpose being subject to modification or change from time to time as supposed emergencies may arise.

Having in view the various statutes in force in this State touching educational affairs, and the decisions of this court, as well as of other courts, bearing on the general subject, we think it may be safely said that every inhabitant of this State, of suitable age, and of reasonably good moral character, not afflicted with any contagious or loathsome disease, and not incapacitated by some mental or physical infirmity, is entitled to admission as a student in the Purdue University.

This right of admission may not be enforced when there is not sufficient room in the university, and may be postponed until the applicant has made some proficiency in merely preliminary studies; but it is a right which the trustees are not authorized to materially abridge, and which they can not, as an abstract proposition, rightfully deny. *Cory* v. *Carter*, 48 Ind. 327 (17 Am. R. 738); *State* v. *Duffy*, 7 Nev. 342 (8 Am. R. 713); *Chase* v. *Stephenson*, 71 Ill. 383; *Trustees, etc.,* v. *People*, 87 Ill. 303 (29 Am. R. 55); *Rulison* v. *Post*, 79 Ill. 567; *People* v. *Board, etc.,* 18 Mich. 400; *Foltz* v. *Hoge*, 54 Cal. 28; *Ward* v. *Flood*, 48 Cal. 36.

The greater number of authorities cited by counsel have reference to the government and control of persons after they have been admitted as students in some scholastic institution, and hence, as we conceive, have no direct application to the real questions involved in this case.

The case of *People, ex rel. Pratt,* v. *Wheaton College*, 40 Ill. 186, much relied on in the argument, is a case of that class; besides, Wheaton College was an institution resting on private endowment, and deriving no aid whatever from taxation, or any other public source.

It is clearly within the power of the trustees, and of the faculty when acting presumably, or otherwise, in their behalf, to absolutely prohibit any connection between the Greek fraternities and the university.

The trustees have also the undoubted authority to prohibit the attendance of students upon the meetings of such Greek fraternities, or from having any other active connection with such organizations, so long as such students remain under the control of the university, whenever such attendance upon the meetings of, or other active connection with, such fraternities tends in any material degree to interfere with the proper relations of students to the university.

As to the propriety of such and similar inhibitions and restrictions, the trustees, aided by the experience of the faculty, ought, and are presumed to be, the better judges, and,

as to all such matters, within reasonable limits, the power of the trustees is plenary and complete. *Roberts* v. *City of Boston*, 5 Cush. 198; *Spiller* v. *Inhabitants, etc.*, 12 Allen, 127; *Hodgkins* v. *Inhabitants, etc.*, 105 Mass. 475; *Ferriter* v. *Tyler*, 48 Vermont, 444 (21 Am. R. 133); *State* v. *Burton*, 45 Wis. 150 (30 Am. R.706); *Spear* v. *Cummings*, 23 Pick. 224; *Donahoe* v. *Richards*, 38 Maine, 379; *Dallas* v. *Fosdick*, 40 How. Pr. 249; *Dritt* v. *Snodgrass*, 66 Mo. 286 (27 Am. R. 343).

But the possession of this great power over a student after he has entered the university does not justify the imposition of either degrading or extraordinary terms as a condition of admission into it. Nor does it justify anything which may be construed as an invidious discrimination against an applicant on account of his previous membership in any one of the Greek fraternities, conceding their character, object and aims to be what they were averred to be in the complaint.

Every student, upon his admission into an institution of learning, impliedly promises to submit to, and to be governed by, all the necessary and proper rules and regulations which have been, or may thereafter be, adopted for the government of the institution, and the exaction of any pledge or condition which requires him to promise more than that operates as a practical abridgment of his right of admission, and involves the exercise of a power greater than has been conferred upon either trustees or the faculty of Purdue University.

Regulations adopted by persons in charge of a school are analogous to by-laws enacted by municipal and other corporations, and both will be annulled by the courts when found to be unauthorized, against common right or palpably unreasonable. Angell and Ames Corporations, section 357; Dillon Mun. Corp., 3d ed., section 369; *People* v. *Medical Society, etc.*, 24 Barb. 570; *People* v. *Medical Society, etc.*, 32 N. Y. 187; *People* v. *Mechanics' Aid Society*, 22 Mich. 86; *Fuller* v. *Plainfield, etc., School*, 6 Conn. 532.

In the first place, the pledge tendered by President White to Hawley was not shown to have been authorized by any

previous general regulation adopted for the government of the university. As applicable to Hawley it was, therefore, special, exceptional and apparently not demanded by any competent authority.

In the next place, it carried with it the implication that membership in the Sigma Chi fraternity might properly be treated as a disqualification for admission as a student in the university, a doctrine wholly inadmissible in its application to Purdue University, or to any of the other public schools or colleges of the State.

If mere membership in any of the so-called Greek fraternities may be treated as a disqualification for admission as a student in a public school, then membership in any other secret or similar society may be converted into a like disqualification, and in this way discriminations might be made against large classes of the inhabitants of the State, in utter disregard of the fundamental ideas upon which our entire educational system is based.

Membership in an inherently immoral society or fraternity might perhaps be urged against the admissibility of a student, upon the ground that such relation to such a society or fraternity tended to establish a want of moral character or moral fitness in the applicant, and in that view the allegations of the complaint as to the character, objects and aims of the Sigma Chi society, and other kindred Greek fraternities, became material and ought not to have been struck out.

Although some of those allegations may have been somewhat argumentative in form, they, as a whole, tended to show that, abstractly considered, there was no impropriety in either becoming a member of, or otherwise connected with, the Sigma Chi fraternity, and that the objections seemingly entertained by the faculty against that and other fraternities of the same class, were not, in some respects at least, well founded.

Our conclusion is that so much of regulation No. 3, adopted by the faculty, as may be construed to impose disabilities on persons already members of the Greek fraternities, and as

requires a written pledge as a condition of admission, is both *ultra vires* and palpably unreasonable, and hence inoperative and void, and that the pledge tendered to Hawley was one which the faculty had no legal right to demand as a condition of his admission.

It follows that the court erred, both in striking out a part of the complaint as irrelevant and immaterial, and in sustaining the demurrer to the complaint.

At the request of the parties, we have considered this case upon the theory that regulation No. 3, *supra,* was adopted by the express authority of the trustees, and hence have made no inquiry as to the authority of the faculty in making regulations for the government of the university, when acting independently of the trustees.

The judgment is reversed, with costs, and the cause remanded for further proceedings not inconsistent with this opinion.

### DISSENTING OPINION.

WOODS, J.—While agreeing with the principal opinion in respect to the power of the trustees and faculty to exclude from the university the Greek letter fraternities, and to prescribe, in their discretion, reasonable rules for the control of the students of the institution, while in attendance and amenable to its regulations, there are propositions in the opinion, besides the conclusion reached, to which I do not assent.

The proposition is put forward, seemingly as pivotal, that the admission of students is one thing, and the government of them after admission is quite another thing, and on the strength of this it is said that the authorities in relation to the government and control of persons after they have been admitted have no direct application to the question involved in the case.

As applicable to the case in the record, the distinction seems to me to be unsubstantial and immaterial.

If the moment a student has passed the portal of the institution he is bound to obey a prescribed rule of the college, he

may, in all reason, be required, before he is permitted to enter, to promise obedience. The final remedy for disobedience is expulsion, and, if there may be expulsion for disobeying, there may be exclusion for refusing to promise compliance with a proper regulation. See *Spear* v. *Cummings*, 23 Pick. 224; *Sherman* v. *Inhabitants, etc.*, 8 Cush. 160; *King* v. *Jefferson City School Board*, 71 Mo. 628; S. C., 36 Am. R. 499. To require such promise can not, in my judgment, be regarded as an "imposition of either degrading or extraordinary terms as a condition of admission." If it may be called a condition of admission, it is not an improper or unwarranted one. It is not every student, nor perhaps the majority of those who are likely to seek admission to such an institution, who has attained the high standard of culture and manhood which will enable him to appreciate, and will insure his respect for that implied obligation which arises from the mere fact of admission to the college; and if the faculty, in their wisdom or as a result of their experience, have determined that an express promise, exacted of all alike, is a more efficient means of securing good order and good behavior, the courts can not safely, or with propriety, undertake to review their decision. Neither is there, in my opinion, anything degrading in the requirement or in the acceptance of such pledge. If there were no express declaration required by law, there would be an implied promise on the part of every foreigner who seeks citizenship in the nation, that he renounce his former allegiance, and be a true and faithful citizen of the Republic. The law, however, is not content with this implied, nor, indeed, with an express promise, but requires besides the sanction of an oath. Yet, so far as I know, it has never been suggested that these oaths of allegiance and of renunciation were degrading to the applicant for citizenship, and much less, in my judgment, can it be deemed derogatory to the character and just pride of the youth of the State, when they seek the benefits of such an institution, that they be required, for the general

good, to give an express promise to abide by those reasonable regulations, which, once they have been admitted, it is conceded they must observe.

There is, perhaps, not one of all the fraternal and secret societies to which reference has been made in the discussion, that does not impose upon its initiate more exacting pledges, or a portentous oath instead.   Every one inducted into an office must take the oath faithfully to perform his duties, and even the churches generally require some declaration of faith or other form of public promise. These are a part of the laws and customs of our social organization; they are certainly not generally deemed to be dishonoring, and are quite too common to be called extraordinary; or, if so, the fact is, to say the least, not so well known and generally accepted as to be the subject of judicial cognizance.

I agree that the special pledge submitted to Hawley was not a proper one, because it did not stop at requiring obedience to existing rules. This fact, however, as I conceive, cuts no figure in the legal aspect of the case.   In order to obtain a mandate for his admission to the college, it was not enough for him to show that an improper obstacle had been opposed to him; he was bound to show affirmatively that he was on all grounds entitled to admission, as well as that he had been excluded for a particular improper cause.   Unless willing to abide by all proper rules of the institution, he was not entitled to enter at all; and, instead of showing that willingness, the complaint shows expressly that one rule of the college he would not promise to obey, not because he considered it derogatory to his honor to make any promise at all (his readiness to promise obedience to the rules on other subjects is declared), but because he disputed the rightful authority of the faculty or trustees to impose *that* regulation upon him.

The real question therefore is whether rule number three is a rule which the courts ought to declare invalid.   Properly interpreted, I think it one which the faculty, under the

sanction of the trustees, had a right to enforce. Taken literally, the rule might be deemed to be an unwarranted effort to interfere with the freedom of those who became students to have any connection whatever with the Greek fraternities, from the time of admission until their final departure, though they formed such connections elsewhere, and in such a way as in no degree to affect their conduct as students; but, properly construed, the rule, in my opinion, has reference to the conduct of the student as such while in attendance, and not when in vacation or at other times he might be absent from the college, beyond the limits of supervision by the faculty and under the authority and admonition of his parents or guardian.

The right of the faculty to exclude these fraternities from the college, and to forbid the student having an active connection with them either in or outside of the college walls, while in attendance as a student, the principal opinion, as I understand it, concedes; and, as I read it, the rule means no more. That the faculty so understood it, is shown by the pledge tendered to Hawley, whereby he was required, not to sever his connection, but only to cease active membership in the society which he had joined. This is a possible and not unreasonable construction of the rule, and should be adopted, so long as there is no averment that a different construction was placed upon it by the college authorities.

In my judgment, the court committed no error in striking out parts of the complaint. The ground on which the learned counsel for the appellant based their objection to the ruling was, that the exscinded averments showed that the Greek fraternities were entitled to admission into the university, and that the rule, or any rule for their exclusion, was beyond the power of the board of trustees or faculty to adopt. The principal opinion, impliedly at least, overrules this position, and, in this respect, is clearly right. Conceding all the excellencies attributed to these fraternities as educational aids, it is still true, so long as a college can not appropriate to itself all such efficient helps, and a selection of the fittest must be made,

that the faculty and board of trustees, rather than the students put under their authority, must dictate the choice. This being so, it seems to me, there is no tenable ground for saying that the allegations in question were at all relevant. They are not relevant to the moral character of the applicant, any more than if he had been a Mason, Odd Fellow, Presbyterian or Methodist, it would have been pertinent to allege the character and aims of those organizations, and to catalogue the distinguished officials and characters which had belonged to them, or to state the conduct of other colleges in reference to them.

I think the judgment ought to be affirmed.

### ON PETITION FOR A REHEARING.

NIBLACK, J.—Accompanying a petition for a rehearing, the appellees have submitted an exhaustive argument, controverting all the material conclusions announced in the opinion in this case, and asking for a reconsideration of the whole case, and, if that can not be granted, then for important modifications and explanations of some portions of the opinion in the form in which it has been promulgated. The Attorney General has also filed a brief on behalf of the trustees of Purdue University, concurring in the request of the appellees.

We have given the cause such further consideration as its importance has demanded, and have made some merely verbal changes in our opinion as originally filed, so as to better express, in some instances, our real meaning. With these changes we are content that the opinion shall stand as the judgment of this court upon the facts as presented by the record.

In legal effect we have only decided that regulation No. 3, adopted by the faculty, and the special pledge tendered to Hawley, fairly implied a discrimination against a class of the inhabitants of this State, as much entitled to admission in the university as any other class, and that to that extent that regulation and that special pledge were both unlawful and unreasonable. All else embraced in the opinion was merely by way of argument and illustration, and as collateral to the

real questions before us, intended to impress upon those most interested the difference between abridging the right of admission into a public school, and the authority to govern and control students after they have been admitted. That difference impressed us then, and still impresses us, as being important in the consideration of this case.

Where all the conditions attaching to an inhabitant of the State are such as to entitle him to admission into a public school, he can not be deprived of that right by the requirement of unusual and exceptional preliminary pledges, directed only against a portion or a class of the people of the State.

Such unusual and exceptional pledges are not only unlawful in their spirit and application, but are unreasonable as productive of irritation, litigation, and generally of injurious consequences to the institution attempting to enforce them. Whether any express pledge, applicable in its operation alike to all, and as preliminary to admission, may, in any case, be required, is a question we have not fully considered, and concerning which nothing has been or is now decided. Nor is it practicable for us to enter into a further discussion of the authority of the trustees or a faculty over students after they have been admitted as such into a public school. It is impossible to foresee, or even to conjecture, every contingency that may arise involving judicial interpretation in that respect. What we have already said on that subject is quite sufficient for our present purpose, and was more than was absolutely necessary to a decision of this cause. Where an inhabitant of the State has acquired the right of admission into a public school, and that right has been unjustly denied, he is as much injured as if some important property right had been invaded, and is as much entitled to appeal to the courts for relief. This has been settled by innumerable precedents and decided cases, and is no longer an open question. It is equally the duty of the courts to grant relief against the enforcement of unjust and unreasonable regulations for the government of public schools, after all ques-

tions of admission have been disposed of. There is nothing in the legislation of this State which deprives our courts of jurisdiction in respect to such controversies, and we know of no reason, originating in public policy, which would deny such jurisdiction to the courts without first providing suitable means for redress before some other competent tribunal.

Courts are reluctant to interpose their authority against the action of school trustees and school boards, and others similarly charged with special and peculiar duties, and ordinarily will not do so, except in cases in which manifest injustice has been done, or some serious mistake has been made, but when a proper case is presented for judicial interference, a plain duty is imposed, which the courts can not and ought not to evade.

The petition for a rehearing is overruled.

WOODS, J., dissents.