

# THE ATTORNEY GENERAL
# OF TEXAS

GERALD C. MANN
WILL WILSON
ATTORNEY GENERAL

AUSTIN 11, TEXAS

Honorable J. R. Parten
The Board of Regents of the
University of Texas
P. O. Box 1403
Houston, Texas

Dear Sir:

Opinion No. 0-2106
Re:  (a) Whether or not a contrac-
tual relation exists between
the University of Texas and
a student.
(b) If contractual relationship
exists, can the parties alter
said contract?

We have for reply your letter of March 20, 1940, desiring to
know whether or not a contractual relationship exists between a student
and the University of Texas under the facts set forth in your letter. In
order that these facts may appear in this opinion as you have stated them,
we quote from your letter:

"The Board of Regents has under consideration an appeal
by a former student from the action of the administrative
officials in denying him admission to the College of Arts and
Sciences at the University of Texas in September, 1939.

"The University of Texas publishes and distributes
catalogues or bulletins. Catalogues are made available to
students and to prospective students as well as the parents
of said students.

"Accordingly a catalogue or bulletin was published
and distributed entitled 'The University of Texas Bulle-
tin, No. 3717 -- May 1, 1937. Catalogue No. Part VI:
College of Arts and Sciences and School of Education."
The provisions of said catalogue cover the scholastic
years 1938-1939 and 1937-1938, respectively. The provi-
sions of said catalogues in respect to the questions here
involved for each of said scholastic years are the same.

"On the inside top cover appears a capitalized head-
ing which reads:  'GENERAL PURPOSE OF THE CATALOGUE.'
Under this heading the following paragraph appears:  'The
Catalogue contains the official regulations for the next

two years. Except as to degree requirements, these regulations are not valid beyond that time.'

"Under a capitalized heading several pages later, GRADUATION UNDER A PARTICULAR CATALOGUE, appears: 'A Student registering either for the first time or in a later year in the College of Arts and Sciences may obtain a degree in the College of Arts and Sciences according to the requirements of the catalogue then in force. . . . All of the above provisions, however, are subject to the restriction that all the requirements for a degree in the College of Arts and Sciences must be completed within six years of the date of the catalogue chosen.' (p. 28)

"Under the capitalized heading 'STANDARD OF WORK REQUIRED' (p. 23) is the sub-capitalized heading 'REQUIRED MINIMUM.' 'To avoid special observation, final trial, or being dropped from the rolls of the University, the student must meet the following standard of work.' . . . . (p. 24)

"The provisions of the catalogues in regard to the 'Required Minimum of Work' appearing at pages 23 and 25 here under consideration. The Provisions of said catalogue in regard to the 'Requirements for a Degree' appearing at pages 27 to 29 inclusive, have not been changed and are still construed to be applicable to the student.

"The student in question entered the College of Arts and Sciences at The University of Texas in September, 1937, under the terms and conditions of the above catalogue or bulletin for the scholastic years 1937-38 and 1938-39.

"During the session of 1937-1938 the student met the scholastic requirements contained in said catalogue or bulletin, and there is no issue or question in regard to his scholastic qualifications for this session.

"On June 25, 1938, after the publication and distribution of the aforesaid catalogue or bulletin, the Board of Regents of the University of Texas, acting upon the recommendations of the Faculty, considered and adopted new regulations or minimum of scholastic requirements for students in the College of Arts and Sciences at the University of Texas. The new standard of work was entitled 'Required Minimum of Work,' the pertinent part of which requirement reads as follows:

"To avoid Scholastic Probation or being dropped from the rolls of the University, the student must meet the following standard of work at the end of each semester of the Long Session.' . . .

"The new requirements are different than those contained in the catalogue for 'Required Minimum of Work' and do not appear therein.

"Between August 15 and September 1, 1938, the Registrar of the University of Texas mailed printed copies of the new scholastic requirements to each student and prospective student whose name and address was known or available to the Registrar from the records of the University, but it is not known whether or not the particular student received such a notice.

"The student in question then returned to the University of Texas and duly registered and was admitted to the College of Arts and Sciences in September, 1938, for the 1938-1939 session. During the fall semester the student made and exceeded the minimum requirements for scholastic work as set out in the catalogue, but failed to meet the new scholastic requirements for said semester and was placed on scholastic probation in February, 1939. When the student failed to meet these new scholastic requirements and was placed on probation, the Dean of the College of Arts and Sciences on February 14, 1939, prepared and mailed the parent of the student in question a notice of said scholastic probation. There appears upon the face of said notice the following statement: ' See over for rules relating to the required minimum of work.' There is printed on the back of said notice a full statement of the new requirements for minimum of work in the College of Arts and Sciences at the University of Texas. At the bottom of the said notice and below a perforated line is a receipt form marked 'IMPORTANT' with the statement 'To be signed and returned to Dean Parlin by the parent or guardian' of the student.

"This receipt reads as follows: 'I have received and read the attached NOTICE OF SCHOLASTIC PROBATION, and I understand and accept the terms thereof.' A receipt of notice of scholastic probation was received by the Dean of the College of Arts and Sciences bearing the name of the father of said student in question written in ink. This signed receipt form is now in the files of the Dean of the College of Arts and Sciences. A copy of the form of said notice is hereto attached for your information.

"The student duly registered in the College of Arts and Sciences for the spring semester of 1939. For said semester the student met the scholastic requirements as published in the catalogue, but again failed to meet the new requirements.

Honorable J. R. Parten, Page 4 (O-2106)

"Under the new scholastic requirements of minimum of
work in the College of Arts and Sciences and by reason of
the student's probation and failure, the student was required
to attend the Summer Session, and if he passed the required
amount of work at said session, he would have been permitted
to re-enter the College of Arts and Sciences in September,
1939, but if he failed to pass such requirements, he would
not have been permitted to have returned and registered in
said College until February, 1940, requiring of him an ab-
sence from the College of one semester. The student refused
to attend the Summer Session, insisting that he had met the
catalogue scholastic requirements and was entitled to con-
tinue in said College without the necessity of attending the
Summer Session, and that the new scholastic requirements were
not applicable to him.

"The parents of the student contend that the catalogue
is a contract and that the Board of Regents would have no
authority to change the scholastic requirements existing at
the time of the student's entrance into the College of Arts
and Sciences and apply them to said student. But, on the
other hand, the Board of Regents contends that it has the
power and authority to make proper and reasonable changes in
the rules in regard to the minimum of work required, either
after proper notice to the student or with the knowledge and
consent of the student's parents or guardian.

"It is conceded that in this case the new scholastic
regulations are different from those contained in the cata-
logue, and that the same were adopted by the Board of Regents
in order to raise the standard of the scholastic work re-
quired to continue in the University of Texas. It is further
conceded that the new rules are more onerous in the require-
ment of proficiency of study.

"The student in question did not become twenty-one years
of age until December 21, 1939.

"Will you please advise me upon the following questions:

"1. Whether or not the catalogue in stating the scholas-
tic requirements for a student to continue in the University
of Texas and the entrance of the student under its terms con-
stitutes a written contract between the University of Texas
and patron?

"2. If you answer to the foregoing question in the
affirmative, then please advise whether or not as a matter
of law under the facts of this case the parties have so

altered, modified, or amended the original contract as
to make the new required minimum of work rules applicable
to the student as was done in this case."

Stated more simply, we have a student who duly registered in
the University of Texas for the scholastic year 1937-1938 pursuant to
the terms of the catalogue of that institution in force at that time
covering the years 1937-1938 and 1938-1939. Among other things the cata-
logue contained certain standards of work required to be met by the stu-
dent in order to avoid being placed under a special observation, upon
final trial, or being dropped from the rolls of the University.

The student met these requirements as contained in the catalogue
under which he entered the University, but during the 1938-1939 scholastic
year he failed to meet certain new standards of work required as adopted
by the Board of Regents of the University of Texas on June 25, 1938,
which are more onerous than those referred in the catalogue under which
said student entered the University of Texas in 1937. The required stand-
ards of work as contained in the catalogue in force in 1937, however, were
at all times met. Because of his failure to meet the new required stand-
ards of work during the 1938-1939 scholastic year the student was placed
upon scholastic probation, and was instructed to attend Summer School. He
refused to attend Summer School, and the University officials refused him
registration in September, 1939.

Your first question is whether or not a contractual relationship
exists between the student and the University of Texas, and the general
rule in this country is that such contractual relationship does exist. As
stated by Professor Williston in his treatise upon the Law of Contracts,

"The general American view is that the relation between
the student and a private institution of learning is contrac-
tual and that a student entering such an institution has con-
structive knowledge of the terms of admission stated in its
catalogue or announcement, especially where the student signs
a registration card referring to and conditioning entrance
upon agreement to the terms so stated. 'The offer is made
up collectively of the terms of the University catalogue,
bulletins issued, and notices printed on registration cards.
All the acts of registration constitute acceptance.'"
I Williston 276.

In accord with this proposition are the following cases:  Booker
v. Grand Rapids Medical College, 156 Mich. 95, 120 N. W. 589, 24 L.R.A.
(N. S.) 447; Tate v. North Pacific College (Sup. Ct. Oregon, 1914) 140
Pac. 743, People v. Bellevue Hospital Medical College, 14 N. Y. Supp. 490,
aff., 28 N.E. 253; Goldstein v. New York University, 78 N. Y. Supp. 739,
Horner School v. Wescott (Sup. Ct. N. C.) 124 N. C. 518, 32 S. E. 885;
14 Corpus Juris Secundum p.1358; Barker v. Trustees of Bryne Mawr College,
et al. (Sup. Ct. Pa.), 278 Pa. 121, 122 Atl. 220; Gott v. Berea College,
156 Ky. 376, 161 S.W. 204, 51 L.R.A. (N. S.) 17, 11 Corpus Juris 984;

Stetson University v. Hunt, 88 Fla. 510, 102 So. 637; Baltimore University v. Colton, 98 Md. 623, 57 Atl. 14.   In accord in Texas are the following cases:  Vidor v. Peacock (C.C.A. 1912) 145 S.W. 672; Terrell Military College v. Taylor (C.C.A. 1925)  275 S.W. 1089; Pierce v. Peacock Military College (C.C.A. 1920) 220 S.W. 191; Peacock Military College v. Hughes (C.C.A. 1920), 225 S.W. 221; Peacock Military College v. Scroggins (C.C.A. 1920) 223 S.W. 232.  England, perhaps because of the traditional independence of her universities, recognizes no such contractual relationship and courts there afford no redress to a student arbitrarily dismissed or otherwise disciplined.  Green v. Master and Fellows of St. Peters College, Cambridge, 31 L. J. 119; Thomsen v. University of London, 33 L. J. C. 625. See also 77 University of Pennsylvania Law Review 694, 1 Williston on Contracts, p. 276.

Volume 27 of Ruling Case Law at page 144, states the rule to be as follows:

"One who is admitted to a college and pays the fees for the first year's instruction has a contract right to be permitted to continue as a student until he, in regular course, attains the diploma and degree which he seeks, and which the institution is authorized to confer, and he cannot be arbitrarily dismissed at the close of a year merely because he is obnoxious to other students on account of his race.  While admitted students are at liberty to terminate all relations at any time, it does not follow that the college or university has the same right.  In fact, when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom.  The required fees may be paid annually, and may be no more than fair fees for the advantages received by the student during the year, and yet it is clear that the fees for the first year are, in fact, paid and received with the understanding that the work of the year will not be made fruitless, a graduation and a degree made impossible, by an arbitrary refusal to permit further attendance. In this understanding there is no want of mutuality.  There is no want of good and valuable consideration.  A law school cannot dismiss a student, or refuse to permit him to graduate, for irregularity in attendance, where its custom, as understood at the time of his matriculation, was that all that was necessary for graduation was payment of the required fees and completion of the work, to accomplish which the student might take such time as was needed. An action for breach of contract is not an adequate remedy for such wrongful expulsion depriving the student of the opportunity of obtaining a diploma and degree to which, under his contract, he is entitled, and mandamus will lie to compel his reinstatement."
. (Underscoring ours).

While there are few reported cases dealing specifically with state universities, we see no reason why the rule should be different.  See State v. White, 82 Ind. 278, 42 Am. Rep. 496, Anthony v. Syracuse University,

223 N. Y. Supp. (2d) 98, 130 Misc. 249, reversed in part, 231 N. Y. Supp. 435; Gleason v. University of Minnesota (Sup. Ct. Minn. 1908), 108 Minn. 359, 116 N.W. 650; People v. The Regents of the University of the State of New York, 199 App. Div. 55, 192 N. Y. Supp. 108; Niedermeyer v. Curators of the University of Missouri, 61 Miss. App. 654; Jackson, et al v. State ex rel Majors (Sup. Ct. Neb. 1898) 57 Neb. 183, 77 N. W. 662; State ex rel Ingersoll v. Clapp, et al, 81 Mont. 200, 263 Pac. 433; 13 Cornell Law Quarterly 85; 12 Virginia Law Review 645; 27 Ruling Case Law 144.

Volume 14 of Corpus Juris Secundum, page 1361, states the rule as follows:

"While the relation existing between the college or university and the student is contractual, precluding an arbitrary refusal to permit further attendance, yet the power of suspension or expulsion of students is an attribute of government of educational institutions, and obviously and of necessity there is implied in the contract a term or condition that the student will obey and conform to the college rules of government and will not be guilty of such misconduct as would be subversive of the discipline of the college or university, or as would show him to be unfit morally to be continued as a member thereof. It has been stated that the rules of educational institutions supported in whole or in part by appropriations from the public treasury are viewed somewhat more critically by the courts than those of private institutions." (Underscoring ours)

In other words, it seems the only distinction made between private institutions and public institutions is that the rules of public institutions are viewed somewhat more critically by the courts than those of private institutions. This is indeed true in Texas, where the reasonable rules and regulations promulgated by the Board of Regents of the University of Texas are viewed with the same force and effect as legislative enactment. Foley v. Benedict, infra.

In Anthony v. Syracuse University, 231 N. Y. Supp. 475, the court held that Syracuse University was a quasi-public institution, and a branch of the educational system of the State of New York. In discussing the relationship between a student and that institution, the court said:

"Under ordinary circumstances and conditions a person matriculating at a university establishes a contractual relationship, under which upon compliance with all reasonable regulations as to scholastic standing, attendance, deportment, payment of tuition, and otherwise, he is entitled to pursue his selected course to completion and receive the degree or certificate awarded for the successful completion of such degree."

Again, in Tate v. North Pacific College (Supreme Court of Oregon, 1914) 140 Pac. 743, the court said:

"The issuance by a college of a catalogue stating the requirements for graduation and for the conferring on candidates of the degree of Doctor of Dental Medicine, and the entrance, matriculation, and attendance of sessions by a student with knowledge of those requirements constitutes a contract by the student to comply with the requirements, and by the college to issue a diploma on compliance with the requirements."

In Neidermeyer v. Curators of the University of Missouri, supra, the catalogue of the state university for the years 1892-1893 contained the statement that applicants for admission to the classes of the law department were required to pay $50.00 for the first year and $40.00 for each successive year. The plaintiff in 1892 paid $50.00 and was admitted to the junior class. The catalogue for the scholastic year 1893-1894 stated that all law students were required to pay $50.00 per year. The plaintiff in 1893 tendered $40.00 for admission to the senior class, was rejected and paid the $50.00 demanded under protest. It was held that the catalogue of the state university constituted an offer and the plaintiff by registering accepted the offer. The court then stated:

"After the proposition contained in the catalogue of 1892-1893 had been accepted by plaintiff, and the rights of the plaintiff had thereby become fixed, it was not within the power of the defendants to alter or abridge those rights by withdrawing the proposition and publishing that contained in the catalogue of 1893 and 1894. And whether the plaintiff had notice of that fact before he applied for admission to the second year's course or not, it seems to us, can make no difference. The proposition contained in the catalogue of 1892-1893 was that of the state, and, when accepted, good faith and fair dealing required it should be carried out on the part of the state to the letter. An enlightened and progressive state can ill afford to trifle with the rights of the citizens in the slightest degree. The court erred in rejecting the theory contained in the plaintiff's instruction and in adopting that contained in those of the defendant's."

In Foley v. Benedict, et al. (Com. App. 1932) 122 Tex. 193, 55 S.W. (2d) 805, the court was concerned with the validity of a regulation adopted by the Board of Regents of the University of Texas requiring a certain standard of proficiency in order for a student to stay in the medical branch of the University. Re-admission was refused the student after he had failed to maintain and meet the standards required. The Commission of Appeals quoted with approval certain passages from the opinion of State v. White, 82 Ind. 278, 42 Am. Rep. 496, which recognized that certain contractual rights exist between a student and a state supported university, held the regulation of the Board of Regents to be a reasonable one, and in the course of this opinion said:

"A student who is admitted to the university receives the privilege of attending that institution subject to the reasonable rules and regulations promulgated by the Board of Regents and existing at the time of his entrance into the school." (Underscoring ours.)

Consequently, we hold in answer to your first question that the catalogues of the University of Texas and bulletins issued, mailed to students and prospective students of that institution, constitute an offer to contract on the part of the state, through the Board of Regents, and that the acts of registration constitute acceptance of such an offer by the student. On the part of the University it is agreed that if the student will pay his registration, and all other required fees and deposits, follow the courses prescribed in the catalogue, maintain ordinary standards of discipline required, and the standards of proficiency in work set out in the catalogue under which he enters the University, it will in due course of time award such student a diploma or degree. On the other hand, the student promises to abide by reasonable rules and regulations concerning his discipline, to follow the courses of study and the scholarship requirements set forth in the catalogue under which he enters the University, and to complete his course within the period prescribed. We hold that such a contract was created under the facts set forth in your letter.

However, were we to hold that a contractual relationship does not exist between the University and one of its students, we believe that under the case of Foley v. Benedict, supra, the result would be the same. In the Benedict case, the Commission of Appeals pointed out that reasonable rules and regulations promulgated by the Board of Regents of the University of Texas have the effect of legislative enactments. The court also made it clear that upon admission a student receives the right of attending the institution subject to the reasonable rules and regulations promulgated by the Board of Regents and existing at the time of his entrance into the school.

In other words, from whatever theory the right may spring, certain fixed or vested rights accrue to the student upon his entrance into the State University "under a particular catalogue". We do not believe that these fixed or vested rights so acquired by the student can be changed or modified to his detriment by the promulgation of retroactive rules and regulations by the Board of Regents of the University of Texas. Such would not be reasonable rules and regulations within the meaning of the Benedict case, supra.

In answer to your second question of whether or not as a matter of law under the facts of the case the parties have altered, modified, or amended the original contract as to make the new required minimum of work rules applicable to the student in question, we must hold that the parties have not as a matter of law under the facts given us altered the contract first entered into in September, 1937, between the student and the University of Texas. The only facts relating to this part of your question show

that notice was given on February 14, 1939, to the parent of the student in question advising that the student had been placed upon scholastic probation and also advising of the new standards of work required.

There is no evidence under the facts set forth in your letter that a contract was ever entered into between the parents of the student and the University with regard to his education. We fail to see, therefore, how notice to the parents of the new rules and of the student being placed upon scholastic probation and acceptance by them of said notice could in anywise alter or modify the contract entered into between the University of Texas and the student in September, 1937. There is no evidence under the facts given us as to any waiver on the part of the student of his right to continue under the original contract, of his own acceptance of the new rules as promulgated by the Board of Regents in 1938; or, even if such an acceptance could be shown, consideration for such an amended contract.

Under the circumstances, we must answer your second question in the negative.

Very truly yours,

ATTORNEY GENERAL OF TEXAS


By /s/ Walter R. Koch
Walter R. Koch
Assistant

By /s/ James D. Smullen
James D. Smullen

JDS:jm:ds

APPROVED APR 16, 1940

/s/ Gerald C. Mann

ATTORNEY GENERAL OF TEXAS

APPROVED
OPINION
COMMITTEE
By /s/ BWB, CHAIRMAN