In the Matter of E. EZRA SOFAIR, Appellant, v STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL CENTER COLLEGE OF MEDICINE, Respondent.

Fourth Department, November 12, 1976

*Hancock, Estabrook, Ryan, Shove & Hust (Richard Cook* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General (Sidney Grossman* and *Ruth Kessler Toch* of counsel), for respondent.

GOLDMAN, J. Petitioner E. Ezra Sofair brought this article 78 proceeding seeking to compel the respondent State University of New York Upstate Medical Center College of Medicine (Medical College) to reinstate him as a student in good standing. Special Term found that "Petitioner has failed to show the necessary bad faith or clear abuse on the part of the Grades Committee in order to establish that the committee acted in an arbitrary and capricious manner" and dismissed the petition without a hearing.

Petitioner's yearly academic reports during his four and one-half years as a student reveal uneven performance. He received a deficiency in pathology in his second year and was promoted to the third year class "contingent upon satisfactory removal" of that deficiency. Although he accomplished this by repeating the course in the summer, his third year results were unsatisfactory with deficiencies in medicine and surgery. Petitioner successfully repeated medicine in the summer of 1974 and surgery in the fall of 1974. His academic difficulties continued in his fourth year when he received a failing grade in nephrology. In June, 1975 when his classmates were graduated, petitioner still lacked two courses for graduation.

In response to his request to take an additional course in

the summer of 1975 petitioner received a letter from the Dean of Admissions and Student Affairs stating, in part, the following:

"Your request for an elective with the Department of Obstetrics and Gynecology was not approved by the Committee on Academic Promotions. This committee of the faculty has decided that you do not meet standards for graduation; and that, in their opinion, you are not ready for the practice of medicine. This decision is based upon your cumulative academic record, comprised of grades and narratives, over the past four years. Your record indicates that you have failed at least one major course every year, and still carry a failing grade in Nephrology, a fourth-year elective. The significance of having failed courses, such as pathology, surgery and medicine, raised serious questions about your level of competency at this time; particularly, your abilities to apply essential medical knowledge to patient-care activities." The letter continued, stating that petitioner must repeat his fourth year by following a structured program of clinical electives, to be designed by a subcommittee of the Committee on Academic Promotions. Petitioner concedes that he waived his right to appeal the committee's decision.

In his second fourth year, commencing in August, 1975, petitioner took four courses, passing three but failing a six-week surgery internship. On February 13, 1976 the Fourth-Year Medical Grades Committee notified petitioner that it was recommending that he be dropped from the Medical College "because he failed to demonstrate sufficient clinical aptitude for the practice of medicine. The second recommendation was that he be given the option to apply for re-admission in 1977 to the third-year; if re-admitted, be re-evaluated after the second clerkship; that he may not enter into the third clerkship without approval and that the selection of clerkships will be under the guidance of a committee". The letter advised him that he had a right to appeal to the Committee on Academic Promotions and that the Committee had reserved the time of 5:30 P.M. the same day for his appeal.

A second letter from the same office, bearing the same date, indicated that the Committee on Academic Promotions had decided to follow the Grades Committee's recommendations, that the petitioner had been given "an opportunity to present personally any pertinent information" and that the decision was "final". Petitioner was further informed that the recom-

mendation that he be allowed to reapply in 1977 "was re-scinded at the meeting of Monday, February 23, 1976 * * * since the Committee on Academic Promotions has no authority to make such a recommendation".

The record includes exhibits in support of petitioner's claim that the college acted arbitrarily and without objective standards when it dismissed him. He states that his National Medical Board scores compared favorably with the national average, and that Dr. Poppers of Bellevue Hospital had agreed to hold his internship open for him for another year while he completed his degree. During his second senior year, petitioner states, he applied for internships through the National Intern and Resident Matching Program by which candidates and hospitals rank each other and are matched by computer. He was accepted to his first choice, he notes, after interviewing with the hospital and submitting an academic transcript along with personal recommendations. The record also includes a 1974 recommendation letter describing petitioner as "keen", "conscientious" and well-motivated and a recommendation letter written by Dean Andreatta some seven weeks before petitioner's dismissal, which concluded that petitioner "has the potential for becoming a satisfactory house officer".

In dismissing the petition, Special Term relied on this oft-invoked rule: "When a university, in expelling a student, acts within its jurisdiction, not arbitrarily but in the exercise of an honest discretion based on facts within its knowledge that justify the exercise of discretion, a court may not review the exercise of its discretion" (Matter of Carr v St. John's Univ., 17 AD2d 632, 634, affd 12 NY2d 802; see, also, People ex rel. Goldenkoff v Albany Law School, 198 App Div 460, 462; Matter of Bonwitt v Albany Med. Center School of Nursing, 77 Misc 2d 269, 271; Balogun v Cornell Univ., 70 Misc 2d 474, 477). Courts may, however, intervene in academic and disciplinary dismissals if they are arbitrary (see, e.g., People ex rel. Cecil v Bellevue Hosp., 60 Hun 107, affd on opn below, 128 NY 621; Connelly v University of Vermont & State Agric. Coll., 244 F Supp 156). Also, as will be discussed later, there is recent case law approving judicial scrutiny of dismissal procedures for compliance with due process requisites.

Appellant argues that his dismissal was arbitrary and capricious per se because respondent acted "contrary to and in violation of its own rules and regulations regarding the status

of its students". He relies on sections of the Medical College Student Handbook which explained the standards and procedures for evaluation. The handbook states: "Throughout the academic year, students are evaluated on a continuum through examinations, both oral and written, and by observations of a more subjective nature in laboratories, discussion groups and in the clinical setting. Each department will make a sincere effort to provide counsel to students whose academic performance, attitude or personal qualities indicate difficulties in passing a course or in further pursuing studies to receive the degree, Doctor of Medicine. Promotion or failure, especially in clinical disciplines, may depend as much upon non-cognitive personal factors as upon the acquisition of factual knowledge. Thus, the ability to relate to patients, honesty and attitude may affect grades positively or adversely." Course grading is on a "pass-fail" basis, with instructors "urged to submit narrative comments along with letter grades". Promotion to the succeeding class, which "depends upon the entire year's work rather than upon performance in individual courses", is governed by the Committee on Academic Promotions. That committee acts upon recommendations of the Grades Committee which is authorized to recommend with or without "qualification", which may include remedial work or "probationary status", or to recommend repetition of part or all of a year, or dismissal for "academic failure".

Appellant notes that the handbook mentions only "inappropriate conduct" and "academic failure", but not "insufficient clinical aptitude" as grounds for dismissal. He also notes that he was carrying only one deficiency at the time of his dismissal, whereas the handbook warns only that two "conditional" grades, or a "conditional" and a failure, "may subject the student to dismissal or the necessity to repeat". Further, he claims that the Grades Committee, in concluding that his clinical skills were deficient, must have overruled the instructors who saw him perform and gave him passing grades which took clinical skill into account. This in itself, appellant urges, was arbitrary.

It seems to us that appellant reads the handbook rules too narrowly. He ignores the statement that enrollment, being a "privilege and not a right", may be terminated at any time "for due cause including deficient academic performance". "Deficient academic performance" would seem to encompass insufficiency of clinical skill. Moreover, we do not conclude

that the evaluation system is arbitrary or irrational because a Grades Committee refused grades given by instructors and evaluates "upon the entire year's work". That procedure seems instead to reflect a frank recognition that course grades alone cannot realistically measure professional skill and that review by a panel helps promote uniformity in those evaluations that call for subjective professional judgment.

Appellant relies on *Matter of Ryan v Hofstra Univ.* (67 Misc 2d 651, 659-661) for the proposition that a college's failure to follow its own rules is arbitrary as a matter of law when a dismissal of a student is involved. *Ryan,* however, involved a disciplinary expulsion for vandalism, and the rule violation consisted in failure to give the accused student a choice, guaranteed by official rules of disciplinary procedure, whether to have the matter heard by a student judiciary board or a dean's committee. Thus, the violation involved a strictly procedural rule which left no room for the exercise of expert judgment.

The present case is more like *Matter of Bonwitt v Albany Med. Center School of Nursing* (77 Misc 2d 269, *supra)* and *Balogun v Cornell Univ.* (70 Misc 2d 474, *supra)* which suggest that literal adherence to internal rules will not be required when the dismissal rests upon expert judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at. While the handbook rules in the present case do not explicitly authorize a *de novo* review of a student's work at the end of four years, they do provide that enrollment may be terminated "at any time for * * * deficient academic performance" and that "the Committee on Academic Promotion will * * * recommend candidates for the M.D. degree". Such language, it seems to us, amounts to a reservation of a right to review at least as clear as that in *Balogun (supra).*

Appellant next argues that his dismissal violated express or implied contractual duties which the college owed him by virtue of the following: (1) Dr. Williams' representations that appellant could take two more electives he needed to graduate, which representations were dishonored when appellant was refused permission to take obstetrics and gynecology; (2) the agreement that appellant would be allowed to take a structured elective program to complete his second fourth year, which was interrupted by his dismissal; (3) "implied contract * * * based on the university-student relationship".

Appellant quotes the following dictum from *Matter of Carr (supra):* "The University cannot take the student's money, allow him to remain and waste his time in whole or in part (because the student might regard it as a waste of time if he does not obtain the degree), and then arbitrarily expel him or arbitrarily refuse, when he has completed the required courses, to confer upon him that which it promised, namely, the degree". *(Matter of Carr v St. John's Univ.,* 17 AD2d, pp 632-633.) He also relies on *Matter of Blank v Board of Higher Educ. of City of N. Y.* (51 Misc 2d 724). There a student, under an arrangement whereby a B.A. degree could be earned after three years of Brooklyn College courses and one year at an approved law school, took two Brooklyn College psychology courses by independent reading while in attendance at Syracuse Law School. He had obtained prior approval from the Brooklyn College Dean, the pre-law advisor, the guidance counselor, the head of the Psychology Department, and the professors of the two courses. The college denied him his B.A. degree because he was not "in attendance" at Brooklyn when he took the psychology courses. Special Term directed Brooklyn to award him the degree, on the theory that the college was estopped to deny that he had met the degree requirements because it was bound by the promises of its agents made within the scope of their apparent authority. However, it should be noted that in *Blank* the quality of the student's work was unquestioned. The college's objection was solely technical. Here, in contrast, the withholding of the degree rests upon the faculty's genuine doubt concerning the student's fitness.

The same reasons distinguish *Matter of Healy v Larsson* (67 Misc 2d 374, affd 35 NY2d 653). It is noteworthy, too, that the Court of Appeals in *Healy* did not reach the "serious questions of law and policy involved in a judicial awarding of an academic degree" *(id.,* p 654).

Appellant's position, which is essentially that the accumulation of the required number of courses with passing grades entitles him *ipso facto* to a degree, fails to recognize the difficulty of devising a grading system that will infallibly reflect the complex variety of skills that make up professional competence. That difficulty requires recognition of a professional school's inherent and overriding public duty, aside from written rules, to take extraordinary measures in unusual

situations, to the end that the professional competence of graduates will be assured.

Appellant's final contention is that the appeal afforded him did not meet the requisites of due process. In *Greenhill v Bailey* (519 F2d 5) it was held that a student who was dismissed from the University of Iowa College of Medicine for "poor academic standing" apparently due to "lack of intellectual ability or insufficient preparation" *(id.,* p 7) was entitled to be "notified in writing of the alleged deficiency in his intellectual ability" and given "an opportunity to appear personally to contest such allegation" *(id.,* p 9). The court reasoned that the dismissal "deprived him of a significant interest in liberty" *(id.,* p 8) because it stigmatized him and rendered it difficult for him to gain admission at other medical schools.

Appellant here was notified in writing of the Grades Committee's recommendation, and he did have "an opportunity to present personally any pertinent information" to the Committee on Academic Promotions, which was also required by the rules to hear "teaching faculty". However, he contends that the procedure nevertheless violated due process for two reasons. The first, which we reject, is that the Committee on Academic Promotions, which heard the appeal, was biased because its composition was "virtually identical" with that of the Grades Committee whose recommendation it was reviewing. Respondent, however, claims that only 2 of the 9 voting members of the Committee on Academic Promotions also sat on the Grades Committee. Even if there was a more substantial overlap, we do not conclude that due process was thereby offended. *Wasson v Trowbridge* (382 F2d 807), cited by appellant, involved a disciplinary expulsion. Such a case typically involves a clear-cut question whether the student engaged in particular offensive conduct, be it cheating, vandalism, drug use or theft. There is some logic in requiring that such a case be reviewed by impartial persons who are free of preconceptions about the student's guilt. But in an academic dismissal, such as the present one, the fact issues are typically complex and instinct with value judgments of the kind that can best be made by persons intimately familiar with the case. Moreover, the proceeding is not so patently adversarial as a disciplinary proceeding.

Appellant's second due process argument is that he was not given adequate time to prepare for his hearing because it was

held the same day as the notification of dismissal. The conclusion that appellant lacked "sufficient clinical aptitude" was presumably based on factual evidence, derived perhaps from grades and narrative evaluations. Moreover, there appears a significant likelihood that the dismissal rested in part upon supposed "personality conflicts" which petitioner experienced in clinical settings. Petitioner should have been told before the hearing the factual basis upon which the Grades Committee reached its conclusion about his clinical competence. This would have allowed him reasonable time to prepare rebuttal and countervailing evidence.

As to the formality of the requisite hearing, the following remark seems pertinent: "We stop short, however, of requiring full trial-type procedures in such situations. A graduate or professional school is, after all, the best judge of its students' academic performance and their ability to master the required curriculum. The presence of attorneys or the imposition of rigid rules of cross-examination at a hearing for a student like Greenhill would serve no useful purpose, notwithstanding that the dismissal in question may be of permanent duration. But an 'informal give-and-take' between the student and the administrative body dismissing him—and foreclosing his opportunity to gain admission at all comparable institutions—would not unduly burden the educational process and would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.' *Goss v. Lopez, supra,* 419 U. S. at 584, 95 S. Ct. at 741." *(Greenhill v Bailey,* 519 F2d 5, 9, *supra.)*

It is clear that this is a subject in which we should not substitute our judgment for that of persons particularly equipped to make a judgment. We do not purport to do this when we conclude that equity will be served if petitioner is given a fair hearing. In the notice setting the date for such a hearing respondent is directed to afford appellant (1) detailed written statement of the evidence relied upon in concluding that he lacked clinical aptitude and (2) an opportunity for an informal hearing after reasonable time to prepare for it. After such a hearing the Medical College will be in a better position to make a judgment as to petitioner's right to continue to pursue his medical studies. If such an opportunity is granted, it will, of course, contain the specific conditions and terms of petitioner's readmission to the college.

The judgment should be reversed and petition granted to

the extent that petitioner should have the hearing provided for herein. The matter should be remitted to the proper authorities at the Medical College for proceedings in accordance with this opinion.

SIMONS, J. (dissenting). It is fundamental that a court may not substitute its judgment for that of educators on academic matters which are solely within the competence of the educational institution. Accepting that rule, the majority find that respondent acted well within its rules and its powers in expelling petitioner in all respects, save one. Thus, they find that the rules of the medical school permitted respondent's Grades Committee to make a subjective evaluation of petitioner's fitness to be a doctor and that such an evaluation could be based upon petitioner's performance throughout his medical school career. Although the majority find no evidence of arbitrary action by the respondent in expelling petitioner, they order a new hearing because they accept petitioner's contention that he was denied adequate time to prepare for the hearing before the Grades Committee.

Significantly, petitioner had advance knowledge that his work was unsatisfactory. Before the start of his second fourth year, he was advised that his poor record indicated he was not ready to practice medicine. That was the reason he was required to repeat the fourth year. He did not appeal that decision nor does he now allege any factual basis justifying his reinstatement other than the statement relied upon by the majority that there appears a significant likelihood that the dismissal rested in part on "personality conflicts". The alleged "personality conflicts" existed in only one of the courses petitioner failed. The entire thrust of his case is his evidence that other people think that he has the competence to be a doctor. But other people, including this court, do not have the responsibility of making that judgment—the respondent does. It evaluated a student who had repeatedly failed to perform his work satisfactorily and found that he was not fit to be a doctor and no amount of rebuttal at some future hearing can change petitioner's record in that respect.

The judgment should be affirmed.

CARDAMONE and WITMER, JJ., concur with GOLDMAN, J.; MARSH P. J., and SIMONS, J., dissent and vote to affirm the judgment in an opinion by SIMONS, J.

Judgment reversed without costs and petition granted to the

extent that petitioner have a hearing and the matter is hereby remitted to the proper authorities at the State University of New York Upstate Medical Center College of Medicine for further proceedings in accordance with opinion by GOLDMAN, J.