James E. NEEL, Appellant
(Plaintiff Below),

v.

I. U. BOARD OF TRUSTEES and Ralph McDonald, Appellees
(Defendants Below).

No. 2–281A43.

Court of Appeals of Indiana,
Second District.

May 27, 1982.

Belle T. Choate, Mary Beth Ramey, Indianapolis, for appellant.

Dorothy Frapwell, Bloomington, Cory Brundage, Ice, Miller, Donadio & Ryan, Indianapolis, for appellees.

SULLIVAN, Judge.

The Appellant James E. Neel, plaintiff below, sought a permanent injunction compelling the appellees, Indiana University Board of Trustees and Ralph McDonald, Dean of the Indiana University School of Dentistry (hereinafter collectively referred to as the "Dental School"), to reinstate him as a student in good standing at the Dental School. The trial court granted a preliminary injunction but, after an Ind.Rules of Procedure, Trial Rule 65(A)(2) consolidated hearing on the merits, refused to grant a permanent injunction and entered judgment in favor of the Dental School.

The following issues are presented for review:

I. Whether the trial court erred in failing to find a breach of contract by the Appellees;

II. Whether the procedure used by the Dental School in dismissing the Appellant violated his right to due process; and

III. Whether the trial court erred in failing to list specially its findings of facts and state its conclusions thereon as required by Ind.Rules of Procedure, Trial Rule 52(A) in granting or refusing to grant a preliminary injunction.

FACTS

Neel began his study of dentistry at the Dental School in August, 1977. He completed five semesters of an eight semester curriculum. Although the record does not set forth his performance before the Fall Semester 1979, it is clear he had an accumulated grade point average of greater than 2.0 (on a 4.0 scale). He had been on academic probation one semester, but was not on probation at the time of his dismissal.

In the Fall Semester, 1979, Neel recorded a grade point average of 1.6. He also accumulated an extremely low clinical performance record. His greatest deficiency was in his consistent record of absences.

Neel was enrolled that semester in a clinical oral surgery course taught by Dr. James Dirlam. The class consisted of five assigned clinics and two seminars. The Appellant did not attend any of the clinics and missed at least one of the seminars. Dr. Dirlam stated that Neel called with an excuse for two of the clinics.

Neel also was deficient in his clinical periodontics course taught by Dr. Timothy O'Leary. Neel was expected to have completed at least one treatment plan and five root cleanings in that course. He scheduled five patients, but cancelled all five, three on the date of the appointment.

In cumulative clinical work among third year dental students, Neel had accumulated 21 points, the lowest in the class. The average number of points accumulated by a third year student was 74.66.

In one lecture course taught by Dr. Robert Bogan, Neel attended one class session out of a total of seven. He claimed he had never been told the six absences were unexcused, but admitted he knew "the obligation to appear [was] there."

During the semester, a number of his professors talked to Neel about this pattern of absences. Dr. Kaneshiro counseled him regarding his deficiencies in Periodontics. Dr. Maesaka, the Director of Clinical Dentistry, recalled that he had talked to Neel on at least three occasions. Dr. Bogan, Dean of Student Affairs and a professor in Neel's prosthodontics course, talked to him about his absences from that course and because three professors of clinical courses had reported Neel's excessive absences and deficiencies. Neel told Dr. Bogan that he was mentally fatigued, but gave no indication what he was doing to overcome this fatigue. Neel told Dr. Dirlam that he was unsure of himself and had a dread of going to clinics, so he avoided them.

Neel first learned that he might be dismissed from Dental School on or about December 7, 1979, from Dr. Maesaka, the Director of Clinical Dentistry. Thereafter, on January 8, 1980, Dr. Paul Starkey, the chairman of the third year promotions committee, informed Neel that the committee would recommend to the faculty council at the council's January 10, 1980 meeting that he be dismissed. Neel was not permitted to address the faculty council meeting on January 10, 1980, although he appeared at the time and place indicated to him.

By letter dated January 11, 1980, Dr. Ralph McDonald, Dean of the Dental School, notified Neel that he was dismissed from the Dental School "effective immediately." The stated bases for his dismissal were his unsatisfactory grades, his deficiency in clinical achievement, and a "lack of responsibility in the management of [his] clinical practice."

Neel had requested an appeal before he received the letter. The Dental School allowed him to continue attending school during the pendency of his appeal. He appeared before the third year promotions committee on January 10, 1980. He appeared in person and with an attorney and made a presentation before the faculty council on January 25, 1980. By letter dated January 28, 1980, Dean McDonald informed Neel that the faculty council had upheld its decision to dismiss him based on his failure to demonstrate professional responsibility and his low clinical achievement.

## I.

## BREACH OF CONTRACT

The Appellant contends that his dismissal was in violation of the contractual agreement between himself and the Dental School and that the trial court erred in failing to find a breach of contract. He argues that the relationship between the student and university is governed exclusively by the written documents supplied the student upon his matriculation and that they constitute an express, integrated contract.

Courts have analyzed the nature of the student-university relationship under many different legal doctrines. *See Tedeschi v. Wagner College* (N.Y.1980) 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302; *Clayton v. Trustees of Princeton Univ.* (D.N.J.1981) 519 F.Supp. 802, 803; *Slaughter v. Brigham Young Univ.* (10th Cir. 1975) 514 F.2d 622, 626, *cert. denied*, 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131. The most pervasive and enduring theory is that the relationship between a student and an educational institution is contractual in nature. *See* Buss, *Easy Cases Make Bad Law: Academic Expulsion and the Uncertain Law of Procedural Due Process*, 65 Iowa L.Rev. 1, 31 n.201 (1979). *See also Note, Contract Law and the Student-University Relationship*, 48 Ind.L.J. 253, 253 (1973) (hereinafter referred to as *Contract Law Note*). The terms of the contract, however, are rarely delineated, nor do the courts apply contract law rigidly. *See Lyons v. Salve Regina College* (1st Cir. 1977) 565 F.2d 200, *cert. denied*, 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62; *Slaughter v. Brigham Young*

*Univ.*, 514 F.2d at 626; *Sofair v. State Univ. of New York* (App.Div.1976), 54 A.D.2d 287, 388 N.Y.S.2d 453, *rev'd on other grounds*, (N.Y.1978) 44 N.Y.2d 475, 406 N.Y. S.2d 276, 377 N.E.2d 730. As stated in *Olsson v. Board of Higher Education* (N.Y. 1980) 49 N.Y.2d 408, 413, 426 N.Y.S.2d 248, 251, 402 N.E.2d 1150, 1152:

> "[H]ornbook rules cannot be applied mechanically where the 'principal' is an educational institution and the result would be to override a determination concerning a student's academic qualifications. Because such determinations rest in most cases upon the subjective professional judgment of trained educators, the courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community." (citations omitted).

The patchwork of holdings in this area is best characterized as recognizing an implied contract between the student and the university. *Contract Law Note*, 48 Ind.L.J. at 253. The nature of the terms vary:

> "In the area of academic services, the courts' approach has been similar to that used with contracts conditioned upon the satisfaction of one party. The university requires that the student's academic performance be satisfactory to the university in its honest judgment. Absent a showing of bad faith on the part of the university or a professor, the court will not interfere. The good faith judgment model both maximizes academic freedom and provides an acceptable approximation of the educational expectations of the parties." *Id.* at 263 (footnotes omitted).

Indiana has recognized the existence of implied terms in the contract between student and university. *See State ex rel. Stallard v. White* (1882) 82 Ind. 278, 286.

■ Neel places great reliance on the Dental School's failure to follow the detailed procedures set forth in the *IUPUI Student Rights and Responsibilities* handbook, specifically Section 2, entitled "Disciplinary Procedures." These procedures are inapplicable here because they relate to discipline of students "charged with violating University rules of student conduct" *id.* Section 2.1. Neel was dismissed for academic insufficiency. The handbook implicitly recognizes the distinction. Section 1.13(a) lists the conduct for which a student may be penalized. Nowhere is academic insufficiency mentioned, although academic dishonesty is included. This comports with the case law which places sanctions for such conduct as cheating and plagiarism under the more stringent standards applied to disciplinary sanctions. *See Clayton v. Trustees of Princeton Univ.* (D.N.J.1981) 519 F.Supp. 802, 804.

One provision of the handbook does apply in the instant controversy. It states:

> "[Section] 1.1 Students should have accurate and plainly stated information relating to the maintenance of acceptable academic standing, graduation requirements, and individual course objectives and requirements (see, academic bulletins and Code of Academic Ethics)."

The Dental School *Bulletin* in its section entitled "Academic Information" lists various academic standards, including:

> "Attendance.
>
> . . . .
>
> Unexcused absence from clinics will result in the following penalties: first absence, a discussion with the Director of Clinical Dentistry; second absence, a discussion with the Dean; third absence, dismissal from Dental School.
>
> . . . .
>
> Criteria for dismissal:
>
> A. Any dental student who earns probationary status for a total of three semesters and has an earned cumulative grade-point average below 2.0.
>
> B. Any dental student who receives a grade of F in a combined total of 50 percent or more of the semester credit hours in which he or she is enrolled.
>
> C. Any dental student achieving suspension a second time." *Id.* at 6–7.

■ The Dental School concedes that Neel did not fall within any of the three "criteria for dismissal." Rather, the Dental School relies on the attendance policy quot-

ed above, arguing that Neel had three unexcused absences in at least one of his clinical courses. Neel contends that the notices of his dismissal did not mention his unexcused absences as the basis for his dismissal. He argues that the University was required to give him a precise notice of the rule on which the University relied in dismissing him.

Neel mistakenly relies on Section 1.1 of the handbook, quoted above, as requiring a precise notice of the reason for dismissal. Nothing in that section says anything about what a notice of termination must contain. Rather, it places an affirmative duty on the University to inform students of what is required to maintain their academic standing. The Dental School's attendance policy, quoted above, clearly notified Neel that, if he had three unexcused absences from clinics, he would be subject to dismissal.

■ Further, the notices of dismissal did inform Neel of the circumstances of his dismissal. The notices contained phrases such as "clinical achievement significantly below the expected," and "demonstrated . . . lack of responsibility in the management of your clinical practice." These terms were sufficient to tell Neel not only that his attendance was below standard but that his performance was suspect as well.

In *Sofair v. State Univ. of New York*, 388 N.Y.S.2d at 456, the court stated: "[L]iteral adherence to internal rules will not be required when the dismissal rests upon expert judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at."

The administrators and directors of the Dental School have a duty to the public as well as to the student. To countenance repeated irresponsible conduct and to place incompetent or irresponsible dentists in the active practice would surely be to the detriment of the health and safety of the members of society.

■ Neel also argues that the University did not follow the procedure outlined in the absence policy. He contends he did not have a discussion with "the Dean," i.e.,

Dean McDonald, before he was dismissed. The Record shows that both Dr. Maesaka, Director of Clinical Dentistry and Dean Bogan, Dean of Student Affairs, spoke to Neel regarding his pattern of absences. Although Dean Bogan is not the head of the Dental School, the evidence shows that Dean McDonald delegated various duties to other officials. Dean Bogan dealt with students in trouble academically: he drafted the first letter of dismissal to the Appellant; it was to him that the professors reported Neel's absences; and Neel and other failing students were referred to him by Dean McDonald. We have only Neel's speculative contention that he might not have been dismissed if he had had a discussion with Dean McDonald instead of Dean Bogan. Yet Dean McDonald testified that he had no alternative to dismissal when that action was taken by the faculty council.

■ This leads us to examine another set of documents relevant to the relationship between the parties: the faculty constitution and by-laws. The constitution and by-laws of the Dental School create a Student Promotions Committee for each of the Dental School classes. Each committee is to report to the faculty council its recommendations for, among other things, "probation, withdrawal, or dismissal for each student in each respective class at the end of each semester."

Neel testified that he was aware of the student promotion policy. Dr. Paul Starkey, chairman of the third year promotions committee, testified that the committee did not follow written rules and regulations in making its recommendations, but rather "the traditions of evaluating the didactic record, . . . [and] the reports from the director of clinics on clinical performance."

Although this procedure was not set forth in the *Bulletin*, the Appellant was aware of the committee's responsibilities and its power of recommendation. The Dental School student promotion policy was not an integrated agreement; therefore, the standard in interpreting it was that of the reasonable expectations of the parties. *Giles v. How-*

*ard Univ.* (D.D.C.1977) 428 F.Supp. 603. Neel could reasonably have expected that, with his dismal record and the numerous warnings of his professors, he could be dismissed.

■ We find that the Dental School substantially complied with the procedures set forth in the *Bulletin*, the faculty constitution and the by-laws. The standard of review of academic judgments of an educational institution is whether the decision is arbitrary, capricious, or in bad faith. *Connelly v. University of Vermont* (D.Vt.1965) 244 F.Supp. 156; *Gray v. Canisius College of Buffalo* (App.Div.1980) 76 A.D.2d 30, 430 N.Y.S.2d 163. We uphold the trial court's conclusion that the decision to dismiss the Appellant was none of these.

## II.

### DUE PROCESS

■ The Appellant contends that his termination was in violation of due process in that the Appellees failed to comply with the procedure set forth in the *IUPUI Student Rights and Responsibilities* handbook. As discussed above, the provisions in this handbook do not apply to dismissal for failure to meet academic requirements. It is clear that the handbook delineates the rights afforded a student accused of misbehavior, not academic failure. The United States Supreme Court has distinguished between the requirements of due process in both types of dismissals and has concluded that, while in the case of a disciplinary dismissal a hearing must be afforded, due process does not require a formal hearing in the case of academic dismissals. *Board of Curators v. Horowitz*, 435 U.S. 78, 90, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978).

The Dental School complied with the procedures set forth in the faculty constitution and by-laws for academic dismissals. Indeed, they went beyond them in affording Neel two hearings, in one of which he appeared with counsel. The Appellant's clinical deficiencies and absences were discussed with him a number of times. In their dismissal of the Appellant for academic rea-

sons, the Dental School was within the bounds of any constitutionally required due process. *See Miller v. Hamline Univ. School of Law* (8th Cir. 1979) 601 F.2d 970; *Sofair v. State Univ. of New York, supra.*

## III.

### SPECIAL FINDINGS

■ Neel contends that the trial court erred in not entering special findings of fact because the hearing involved a petition for preliminary injunction. Although Ind. Rules of Procedure, Trial Rule 52(A)(1) requires that special findings of fact be made without request in granting or refusing a preliminary injunction, the judgment entry from which Neel appeals was not an entry granting or refusing to grant a preliminary injunction. Rather, the judgment entry dealt with the merits of the controversy and denied a permanent injunction. The trial court had previously granted a preliminary injunction without entering special findings of facts in February 1980. Neel has waived his right to raise this issue on appeal by failing to take a timely interlocutory appeal under Ind.Rules of Procedure, Appellate Rule 3. *Franzen v. Carmichael* (3d Dist. 1980) Ind.App., 398 N.E.2d 1379, 1380.

The judgment of the trial court is affirmed.

BUCHANAN, C. J., and SHIELDS, J., concur.