[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Shailesh Gupta, M.D., brought this breach of contract action against defendant, New Britain General Hospital ("NBGH").
Defendant NBGH now moves for summary judgment on the grounds that it is entitled to judgment as a matter of law. They claim plaintiff's current claims are barred by the doctrine of res judicata, and as a matter of law because plaintiff cannot sustain a claim for breach of an educational contract.
The plaintiff was terminated from the surgical residency program of NBGH in October of 1988. NBGH administered a five year surgical residency program, part of which involved the "rotation out" of surgical residents to other area hospitals, including The University of Connecticut Health Center and the Shriners Burns Institute.
In this case, surgical residents applied for admission to the program and, if accepted, entered into a one-year contract, the Resident Physician Agreement, as part of the program. The term of the Resident Physician Agreement was from July 1 to June 30 of the following year. This contract provided that
 [t]he general objectives of the Program are to provide to the Physician a proper educational experience in the professional field encompassed by the Program while simultaneously providing to the Hospital's patients a high quality of health care. The Hospital represents that the Program is, and will continue to be, properly accredited by all CT Page 3575 necessary accrediting authorities. The Hospital will maintain its staffing and facilities so as to maintain such accreditation and to provide a proper educational setting for the Program.
The Agreement further provided that "[t]he Physician agrees to fulfill all educational requirements of the Program and further to provide safe, effective and compassionate health care to Hospital patients during the Program period."
The surgical residency was a program designed to provide medical school graduates with practical training and clinical skills. Residents were evaluated by the respective chiefs of surgery and attending staffs of each hospital to which they rotated. Advancement through each phase of the Program was based on the evaluation of the performance of the resident by the clinical faculty of the Department of Surgery at NBGH. Upon completion of each one-year period, residents were evaluated and could be advanced to the next level of training and engaged for another one-year term. Successful completion of the five-year program resulted in the award to a resident of a certificate of completion.
Plaintiff was appointed July 1, 1985 to serve as a second-year resident[1] physician in the surgical residency program of NBGH. His residency was subject to a Resident Physician Agreement, which expired on June 30, 1986.
Plaintiff signed a new Resident Physician Agreement in July, 1986, when he was continued to his third year of residency. The facts show that the plaintiff's conduct did cause concern to his superiors. In March of 1986, physicians with whom the plaintiff had worked were stating concerns about plaintiff's clinical skills and about his ability to complete the surgical residency program.
The record shows that Dr. Richard H. Simon, an Associate Professor in the Department of Surgery at the UConn Health Center, stated "I have serious concerns about the abilities of Dr. Gupta; and, barring a total turn-a-round [sic] in his personality, I would be very reluctant to recommend that he be allowed to finish this program. . . ." [he would become] "so involved with a device, a gadget, or a technique that he [would] subject a patient to inappropriate danger and exposure to make the point." CT Page 3576
Dr. Briggs of the Shriners Burns Institute in his letter of June 16, 1987, stated about the plaintiff, "[h]is lack of basic medical knowledge and inability to relate facts to the clinical situation made it extremely difficult to allow him to assume position[s] of responsibility" with the conclusion that the he "would have significant reservations about advancing him to senior clinical status."
In July of 1987, the plaintiff was placed on probation at the beginning of his fourth year of residency. The plaintiff was warned that if his performance did not improve, he would not be permitted to remain at NBGH for his fifth residency year. In February of 1988, the plaintiff was warned that there had not been sufficient improvement by him to warrant either continued probation or reinstatement as a candidate for a fifth-year resident position. This decision to terminate plaintiff's residency effective July 1, 1988, was later deferred, and plaintiff's probation was extended for ninety days, beginning March 1, 1988.
During this extended probationary period, concerns regarding the plaintiff's skills continued to arise.
At a vote of eleven surgeons in June of 1988 regarding the plaintiff's status, six voted that plaintiff be continued on a strict probationary status with mandatory counseling, but five voted that his residency be terminated as of July 1, 1988.
Based on the vote of June of 1988, plaintiff entered into an Resident Physician Agreement for his fifth year, but continued to be on probation. The defendant imposed four other conditions: (1) that plaintiff was required to spend his entire fifth year at NBGH, rather than rotating out to other hospitals; (2) that plaintiff would only be permitted to operate or supervise a junior resident in the operating room in the presence of an attending surgeon; (3) that plaintiff was required to obtain professional counseling; and (4) that plaintiff's performance would be subject to quarterly evaluations by the General Surgical Section.
Plaintiff's first quarterly evaluation during his fifth year was performed at the end of September, 1988, by the General Surgical Section of NBGH at its monthly section CT Page 3577 meeting. The group unanimously voted that the plaintiff did "not show any potential for being a safe and independent surgeon at the conclusion" of his fifth year, and determined that he would be terminated from the residency program.[2]
Plaintiff was so informed by a letter from Laurence Tanner, President of NBGH, dated October 7, 1988, and was also informed that he had the right, pursuant to the Medical Staff Bylaws, to a hearing before an Ad Hoc Committee of the medical staff.
Plaintiff requested and was granted such a hearing, which was held from November 1, 1988 to November 13, 1988, and at which plaintiff was represented by counsel.
The Ad Hoc Committee heard the testimony of several witnesses and reviewed patient records, plaintiff's personnel file, written evaluations, correspondence, reports of operative experience, medical student evaluations, letters of support, and a written memorandum by plaintiff's attorney. The Committee then concluded that the plaintiff was not qualified as a safe and independent surgeon and that it was not possible for the plaintiff to correct his performance deficiencies by continuing in the program through June, 1989. It also concluded that plaintiff's shortcomings were "significantly attributable to himself." The Ad Hoc Committee therefore recommended that the decision of October 7, dismissing plaintiff from the program, be confirmed.
The plaintiff was notified of this decision by letter dated November 21, 1988, and also notified that he had the right to an appeal of this decision. Plaintiff did appeal, and the Appellate Review Committee, by report dated February 20, 1989 to the NBGH Board of Directors, found that there was ample evidence justifying plaintiff's dismissal from the program, and affirmed that dismissal.
The plaintiff has filed a series of law suits since his termination in both the State and Federal Court. His first suit was in State Court attempting to secure a preliminary injunction against the defendant from removing him from his position as Chief Resident. The defendant (NBGH) removed that case to Federal Court, which was then sent back to the State Court. After a hearing, the Court (O'Neill, J.) denied the motion. After appeal, the case was dismissed for failure to prosecute. CT Page 3578
The plaintiff also filed a complaint of national origin discrimination with the Equal Employment Opportunity Commission. The case was decided without a finding of discrimination. On October 29, 1991 the plaintiff filed an action in Federal Court which was dismissed. In between the filing of the federal suit in 1991 and the decision by the court, the plaintiff refiled his state suit under Conn. Accidental Failure of Suit Statute which was dismissed for failure to file within the one year statutory period.
SUMMARY JUDGMENT
Summary judgment is granted when the pleadings affidavits, and other documents submitted demonstrate there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Practice Book Section 378 et seq.; Orenstein v. Old Buckingham Corporation,205 Conn. 572, 574 (1987); Telesco v. Telesco, 187 Conn. 715,718 (1982). A material fact is one that would alter the outcome of the case. Catz v. Rubenstein, 201 Conn. 39, 48
(1986). The "`[m]ere assertions of fact, whether contained in a complaint or brief are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § 380.'" Kakadelis v. DeFabritis, 191 Conn. 276, 281 (1983), quoting Bartha v. Waterbury House Wrecking Co., 190 Conn. 8,12 (1983). Summary judgment is a vehicle by which cases may be disposed in a manner that is "speedier and less expensive for all concerned than a full-dress trial." Orenstein v. OldBuckingham Corporation, 205 Conn. at 475; Town Bank TrustCo. v. Benson, 176 Conn. 304, 307 (1978).
RES JUDICATA
The defendant claims that this court should dismiss this action by applying the doctrine of res judicata. This argument is based upon a dismissal of a similar suit filed by the plaintiff in Federal Court in 1991. The record shows that a motion for dismissal was filed under Federal Rules of Procedure 12(b)(6). A review of the suit shows that the plaintiff alleged violations of Title VII, 42 U.S.C. § 1981,42 U.S.C. § 1985 (3); the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002 et. seq., the Equal Pay Act of 1963,29 U.S.C. § 206 et seq. and the Rehabilitation Act of 1973, CT Page 357929 U.S.C. § 701 et seq. The matter was heard by the court and a decision was rendered which stated: "Granted After Oral Argument." It is the defendant's position that the decision of the Federal Court was a judgment on the merits, therefore this action is res judicata. See Exchange National Bank ofChicago v. Touche Ross Co., 544 F.2d 1126, 1131 (2d Cir. 1976).
It is the defendant's claim that 12(b)(6) motion dismissal should be treated as a judgment on the merits. As our Supreme Court has stated:
 Under the doctrine of res judicata, a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim. A judgment is final not only as to every matter which was offered to sustain the claim, but also as to any other admissible matter which might have been offered for that purpose. New England Rehab. Hosp. of Hartford, Inc. v. CHHC, 226 Conn. 105, 128 (1993).
In examining the Exchange decision the 2nd Cir. Court of Appeals referred to 12(b)(6) judgments "are on the merits, with res judicata effects, . . . However the defendant has pointed to no other cases following the circuit pronouncement. Although there was an oral hearing on the matter, the motion was granted for failure to state a claim upon which relief can be granted. It is this court's finding that there has been no decision that constitutes a final judgment rendered upon the merits. Telesco v. Telesco, 107 Conn. 715 (1982).
In his complaint, the plaintiff claims that he signed "a binding bilateral employment contract" with the defendant. The plaintiff, pursuant to the terms "reasonably expected to be trained in accordance with the standards for surgeons . . ." The plaintiff goes on to claim the defendant-hospital failed to establish or otherwise offer the plaintiffs a training program that would reasonably and adequately train him. Further, the defendant "failed to train . . . in a proper and reasonable manner. . . " In conclusion of count one the plaintiff claims the defendant's actions constituted a breach of the terms and conditions of employment. (Emphasis supplied.)
The Residing Physician Agreement, which includes CT Page 3580 Residents, Interns and Fellows states:
 The general objectives of the Program are to provide to the Physician a proper educational experience in the professional field encompassed by the Program while simultaneously providing to the Hospital's patients a high quality of health care. The Hospital represents that the Program is, and will continue to be, properly accredited by all necessary accrediting authorities. The Hospital will maintain its staffing and facilities so as to maintain such accreditation and to provide a proper educational setting for the Program. The Physician's duty time in the Program will be scheduled by the Program Director with due regard for the needs of Hospital patients and the educational interest of the Physician. (Emphasis supplied.)
 The Program covered by this Agreement is a part of an overall program of education provided at the Hospital. If the Program is not the concluding part of such an overall program and if the Physician successfully fulfills his or her obligations under this Agreement during the Program period and is recommended for advancement by the Program Director, the Hospital will renew this Agreement for the subsequent part of the overall program upon terms to be agreed upon at the time of renewal. If the Program is the concluding part of such an overall program and if the Physician successfully fulfills his or her obligations under this Agreement during the Program period, the Hospital will certify in proper fashion that the Physician has successfully completed the overall Program.
It is expected that if either party shall have reason not to renew this Agreement as above contemplated, such party shall give notice of that fact to the other not less than ninety (90) days prior to the end of the Program period.
In the obligation portion of the Agreement, the physician agreed to:
 fulfill all educational requirement of the Program and further to provide safe, effective and compassionate health care to Hospital patients during the Program period. Furthermore, the Physician shall comply with CT Page 3581 all laws, bylaws, rules, regulations and policies to which the Hospital is subject or which the Hospital shall from time to time adopt and shall exhibit professional conduct at all times while on duty or engaged in any activity under the auspices of the Hospital. The Physician shall comply with all proper directives and instructions of the Program Director.
 During the term of this Agreement, the Physician will be a member of the Hospital's Medical Staff, having all of the rights and responsibilities attendant upon such membership as set forth in the Hospital and Medical Staff bylaws or as modified by this Agreement. Subject to prior approval by the Program Director, the Physician may engage in any outside activity which does not interfere with his or her obligations under this Agreement.
In reviewing the above agreement, this court finds that the consistent purpose of the agreement is to provide an educational opportunity. There is clearly an emphasis to provide an education in the chosen field with tightly drawn educational paths of advancement. The educational program not only provided opportunities within the defendant's institution but purposely contemplated yearly residencies in other institutions such as UConn Health Center and the Shriners Burns Institute. Even though the plaintiff was minimally compensated for his services, and granted some benefits of employment; those benefits were still subject to the educational requirements of the 5 year program.
EMPLOYMENT CONTRACT
The linchpin of the plaintiff's complaint is that his agreement as a resident physician with the defendant is an employment contract. This court disagrees. The record shows that without the educational component of the contract, the plaintiff would/could not have participated as a physician at the hospital. The working portion of the agreement embraces some elements of a pure employment relationship but they are still based upon the educational purpose of the agreement. The relationship between the parties is based upon an academic relationship, not employment or a job.
Courts have historically been unwilling to apply mechanical contract rules to the academic relationship between CT Page 3582 a student and an educational institution. See e.g.,Mahavongsanan v. Hall, 529 F.2d 448 (5th Cir. 1976). InMahavongsanan, the court held that a student's contractual claims for the receipt of a diploma must be reviewed in a manner that affords the institution sufficient discretion to properly exercise its educational responsibility. The plaintiff there had sued to compel a state university to grant her a graduate teaching degree after the university refused to grant the degree because the plaintiff twice failed a comprehensive academic examination. The court rejected the plaintiff's breach of contract claim, stating:
 We find [this claim] to be without merit because of the wide latitude and discretion afforded by the courts to educational institutions in framing their academic degree requirements [citations omitted] . . . . The appellee's claim of a binding absolute unchangeable contract is particularly anomalous in the context of training professional teachers in post graduate level work.
Id., at 450; see also Janson v. Emory University, 440 F. Sup. 1060
(N.D. Ga. 1977).
The Jansen plaintiff sued the defendant University for breach of contract. In addressing this contract claim, the court noted that the plaintiff's "claim of such a contract iseven more anomalous in the context of the health care profession" than was the graduate teaching student's claim inMahavongsanan, 440 Supp. at 1063 (emphasis added). In so holding, the Jansen court recognized that "[a] medical school must be the judge of the qualifications of its students to be granted a degree; courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine." Id., quoting Connelly,224 F. Supp. at 156; see also Board of Curators v. Horowitz,435 U.S. 78, 91-92 (1978) (recognizing that the Courts are "ill-equipped to evaluate academic performance").
When dealing with students in a health care profession, another, perhaps more important concern is at issue:
 The Administrators and directors of the [hospital] have a duty to the public as well as to the student. To countenance repeated irresponsible conduct and to place CT Page 3583 incompetent or irresponsible [doctors] in the active practice would surely be to the detriment of the health and safety of the members of society.
Neel v. I.U. Board of Trustees, 435 N.E.2d 607, 612 (Ind.App. 1982).
This court finds that the facts show that the decision to dismiss the plaintiff from the program was an academic decision by the defendant and not subject to review as breach of an educational/employment contract.[3]
Wading into who should practice medicine in specialized fields requires courts to give wide latitude to educational institutions in academic situations. As stated in Connelly v.University of Vermont and State Agr. College, 244 F. Sup. 156
(1965).
 Where a medical student has been dismissed for a failure to attain a proper standard of scholarship, two questions may be involved; the first is, was the student in fact delinquent in his studies or unfit for the practice of medicine? The second question is, were the school authorities motivated by malice or bad faith in dismissing the student, or did they act arbitrarily or capriciously? In general, the first questions is not a matter for judicial review. However, a student dismissal motivated by bad faith, arbitrariness or capriciousness may be actionable.
Whether the plaintiff should have graduated to the next level or remained in the institution at all has to be a decision solely within the provence of the medical community, who alone are qualified to make such a determination. Unless the defendant has acted arbitrarily, capriciously or in bad faith, this court would be hesitant to interfere with the determinations.[4]
The Motion for Summary Judgment is granted
Norko, J.