**Robyn CLIFTON–DAVIS, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. 87774.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Dec. 10, 1996.

Mark S. Stanley, Tulsa, for Appellant.

Julie Jones Corley, Assistant Attorney General, Oklahoma City, for Appellee.

### *MEMORANDUM OPINION*

TAYLOR, Presiding Judge.

Plaintiff, Robyn Clifton–Davis, appeals from the trial court's grant of summary judgment in favor of Defendant, the State of

Oklahoma (State), on Clifton–Davis' claim for damages allegedly caused by State's failure to award her a bachelor's degree as a therapeutic recreation specialist. Clifton–Davis prosecutes this appeal under the accelerated procedures of Civil Appellate Procedure Rule 1.203(A), 12 O.S.Supp.1995, ch. 15, app. 2. We affirm.

The record reflects that Clifton–Davis was a student at Oklahoma State University during the mid- to late 1980s, enrolled in the therapeutic recreation program of OSU's School of Health, Physical Education and Leisure Services (HPEL). It is undisputed that Clifton–Davis suffered from periodic seizures and short- and long-term memory loss caused by encephalitis, which she had contracted the year before she entered OSU. Her advisor and instructor at OSU, Dr. Jerry Jordan, was aware, per Clifton–Davis' disclosure to him, that she suffered seizures. Jordan's deposition testimony reflects that he did not believe the seizures impeded Clifton–Davis' successful completion of the therapeutic recreation program, however, and Clifton–Davis admitted that she did not believe she was discriminated against because of her condition. Clifton–Davis completed all of her classroom course work at OSU with grades satisfactory to fulfill degree requirements.

The therapeutic recreation program also required, as a prerequisite to graduation, successful completion of a fourteen-week professional internship in an agency or facility related to the student's career objectives. Internships were available at certain agencies and medical facilities that had agreed to participate in the internship program. Participating agencies entered into a contract with OSU under which the facility agreed to make an internship available to eligible students, and to supervise and evaluate students. However, the facility also specifically retained the right to refuse to allow use of its services by any student not meeting "the professional or other requirements of the [facility] or any appropriate authority controlling and directing" the facility.

Clifton–Davis arranged to serve her internship at St. John Medical Center (St. John) in Tulsa, and began working there in late January 1989. A few weeks into the internship, however, the director of therapy services at St. John contacted Jordan and, after attempting to work out problems they had had with Clifton–Davis, requested that her internship be terminated, citing inadequate skills and inappropriate behavior.[1] According to Jordan's deposition testimony, he discussed the matter with Clifton–Davis and arranged for her to begin serving another internship with Kaiser Rehabilitation Center (Kaiser) at Hillcrest Medical Center in Tulsa.[2] After a few weeks, Kaiser also informed Jordan that it wished to terminate Clifton–Davis' internship. The reasons cited were similar to those cited by St. John, including inability to communicate with patients and personnel, and inability to adequately assess and plan goal-oriented treatment. On its written evaluation, Kaiser also rated her performance in the low-average to below-average range.

Clifton–Davis was removed from that internship as well, and received a failing grade for the course. As a result, she was not awarded a degree or permitted to graduate. Her deposition testimony indicates that she has not received a degree or taken any other

1. The evaluation forms completed by Clifton–Davis' supervisors at the facility indicated the majority of her interpersonal and professional skills were far below average or poor, and included comments such as the following:

Displays inability to delineate between professional & personal boundaries, while engaged in therapeutic internship setting. . . .
[S]eems somewhat overwhelmed with the case load and the nature of the population related to patient hospitalization . . . appears to be lacking in initiative [and] seemed to deny any attempts to remedy the above situation with the help of her supervisors; while appearing oblivious to input & constructive comments. . . .
[H]as inability to understand & empathize [with] others secondary to self absorption in personal and physical ailments/abilities. . . . Poor insight into group dynamics. . . . Inability to express self in a professional manner to supervisors, peers or clients frequently to the point of being socially unacceptable. . . .

2. Clifton–Davis indicated in her deposition that she could not recall the substance of any conversations she may have had with Jordan, nor could she remember much of anything else about her undergraduate years at OSU.

course work since leaving OSU, other than a sign language course at a local junior college.

Clifton–Davis filed this action in November 1990 alleging theories of recovery sounding in negligence, intentional infliction of emotional distress, breach of contract, and violation of her civil rights. In May 1996, State moved for summary judgment. Clifton–Davis' response sought judgment determining liability issues in her favor. The trial court entered judgment in favor of State in July 1996, and Clifton–Davis filed this appeal.

Despite her reliance on several theories of recovery at the trial court level, Clifton–Davis raises only two allegations of error here: 1) that the trial court erred by finding no issues of disputed fact existed concerning whether State breached an "implied contract" with Clifton–Davis "to offer a course curriculum to its students" and to confer "a degree on anybody who successfully completes the curriculum"; and 2) that the trial court erred because State violated the Americans with Disabilities Act.[3] The latter issue was not raised in the trial court, however, and as such is not properly before us for review. We therefore reject a claim of error on the latter ground.

We also reject, as a matter of law, Clifton–Davis' argument that State has breached a contract with her. While the issue of whether an implied contract exists between a university and its student has not previously been addressed by the Oklahoma Supreme Court, other jurisdictions considering the issue have found that such a contract may arise. *See, e.g., University of Miami v. Militana,* 184 So.2d 701 (Fla.Dist.Ct.App.1966); *Neel v. I.U. Bd. of Trustees,* 435 N.E.2d 607 (Ind.Ct.App.1982); *Vought v. Teachers College of Columbia Univ.,* 127 A.D.2d 654, 511 N.Y.S.2d 880 (1987); *Tate v. North Pac. College,* 70 Or. 160, 140 P. 743 (1914); 15A Am.Jur.2d *Colleges and Universities* § 30 (1976). Under these cases, the contract's terms and the conditions required in order to receive a degree consist of the rules and regulations of the university, student handbooks and manuals, course curriculum guides, and the like.

However, case law also consistently has recognized the nature of decisionmaking concerning students' academic status and progress, and has placed almost absolute discretion for such decisionmaking squarely with the university. *See Tate,* 140 P. at 745–46; *Militana,* 184 So.2d at 704; *Neel,* 435 N.E.2d at 612; *see also Gaspar v. Bruton,* 513 F.2d 843 (10th Cir.1975) (interpreting Oklahoma law). The United States Supreme Court has noted:

> Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision-making.

*Board of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 90, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978). See also 15A Am.Jur.2d *Colleges and Universities* § 30, stating:

> On the question of determining whether a student has failed to meet the academic requirements of a school, *there is an absolute discretion permitted the school authorities* and the courts will not interfere unless such authorities are shown to have acted in bad faith or exercised their discretion arbitrarily or capriciously; and the burden is on the student to show that his dismissal was motivated by arbitrariness, capriciousness, or bad faith.

*Id.* at 292 (emphasis added) (footnotes omitted).

Here, even assuming for the sake of argument that a contract exists between the parties, and viewing all of the evidence most favorably to the plaintiff, we do not find material disputed facts in the record that reasonably could lead a jury to conclude that State's actions were arbitrary, capricious, or in bad faith. OSU Academic Regulation 7.1 clearly explains that all "responsibility for satisfying all requirements for a degree" rests with the student. The same regulation states that the task of "advisers, faculty members and administrators" is to "offer

---

**3.** We presume this reference is to 42 U.S.C. §§ 12101, et seq., enacted in July 1990.

**836**

help to the student in meeting this responsibility."

The HPEL Internship Manual—written as a guide for agencies and students participating in the internship program—contains a copy of the contract that participating facilities enter with OSU, containing language reserving a right in the agency to refuse to allow participation by a student who fails to meet the facility's standards. As Clifton–Davis argues, language in the manual indicates that removal of a student from a facility will occur "when both the agency and the intern agree that a different assignment would be in the best interest of the student." Though Clifton–Davis could not recall any of her conversations with Jordan concerning her removal from either of the facilities in question, assuming that she disagreed with Jordan, there is nothing in the manual to suggest that such was the *exclusive* means by which the university could terminate an internship. We believe that reading such a term into the manual would run contrary to reason under the undisputed facts presented here: i.e., the intern's relationship with the facility deteriorated to the point that the facility requested that the intern be removed; the facility provided documentation showing the intern's performance clearly did not meet the facility's standards; and the facility has advised the intern and the university of the problems and has attempted, unsuccessfully, to resolve them.

Oklahoma law requires that a contract "must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect...." 15 O.S.1991 § 159. Further, "[a]ll things that in law or usage are considered as incidental to a contract, or as necessary to carry it into effect, are implied therefrom...." 15 O.S.1991 § 172. The only cases on which Clifton–Davis relies to support her argument for breach of contract—*Cox v. Curnutt*, 271 P.2d 342 (Okla.1954), a construction contract case, and *Cotner v. Mundy*, 92 Okla. 268, 219 P. 321 (1923), a lease cancellation case—both recognize these precepts.

Clifton–Davis' failure to meet the standards of each of the medical facilities where she was placed for internship was well documented in the record, as was Jordan's effort to work out the problems and assist Clifton–Davis. The evidence does not support Clifton–Davis' contention that a material fact issue is present as to whether Jordan's actions were unauthorized, or that he acted against her best interest in breach of the parties' implied contract. Under the circumstances, we believe Jordan's authority to act as he did was implied in the terms of State's agreement with Clifton–Davis, and was not in breach of that agreement. Accordingly, we find the trial court's decision to enter summary judgment in favor of State to be supported by the record and consistent with law. The decision is therefore AFFIRMED.

RAPP, C.J., and REIF, J., concur.